# PELTON & ASSOCIATES PC

ATTORNEYS AT LAW

111 BROADWAY, SUITE 1503, NEW YORK, NY 10006

PHONE: (212) 385-9700 | FAX: (212) 385-0800 | WEBSITE: www.peltonlaw.com

**BRENT E. PELTON**
E-MAIL: pelton@peltonlaw.com

August 19, 2015

**VIA ECF**

Honorable Vernon S. Broderick
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square, Room 415
New York, New York 10007

      Re:    *Callier v. Fancy Hands, Inc.*
                Civil Action No. 15 Civ. 2232 (VSB)

Dear Judge Broderick:

      This letter, jointly drafted by named plaintiff Callier, opt-in plaintiffs Keene, Ford, Villanueva, and Raffo (the "Plaintiffs") and defendant Fancy Hands, Inc. ("Fancy Hands" or, the "Defendant"), is submitted in accordance with Your Honor's August 7, 2015 Order (Dkt. No. 16) to provide information relevant to the parties' consideration in reaching the settlement to allow the Court to assess whether the proposed settlement is fair, reasonable and adequate.

**I.**      **Introduction**

      Named Plaintiff Callier commenced this action by filing a Collective Action Complaint on March 245, 2015 seeking unpaid minimum wage and overtime premium pay pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq*. (Dkt. No. 1). Fancy Hands, a start-up operating in the gig economy, connects clients, via an online marketplace, with virtual assistants who perform tasks for the clients. The Plaintiffs worked as virtual assistants and were paid on a per-task basis. In the Complaint, Callier alleged that she was misclassified by Defendant as an independent contractor despite being treated as a standard employee, and that for her work, she was paid on a per-task basis regardless of the amount of time spent completing a task which frequently resulted in wages of less than minimum wage and no overtime premium pay for time spent performing tasks in excess of 40 hours in a given week. (*See generally Id*.).

      Soon after filing the Complaint, Defendant's counsel reached out to Plaintiffs' counsel in an attempt to facilitate an early resolution of the action. Counsel for the parties, as well as Fancy Hands' founder and Chief Executive Officer, held an in-person meeting to discuss, *inter alia*, the Defendant's financial status and the necessity of resolving the action to continue with their business. After an informal exchange of Plaintiffs' work records and Defendant's financial information, the parties made the decision that it was in the best interest of all parties to attempt

to reach an early settlement.[1] To that end, the parties agreed to extend Defendant's time to respond to the Complaint while the parties continued to negotiate over the course of the next several months relating to the amount of the settlement and the other settlement terms. The individual settlement agreements attached hereto as Exhibits A through E are the result of these negotiations.

## II. The Proposed Settlement Accounts for Substantial Litigation Risk

From the beginning of the action, the parties have held very different views about both (a) the merits of the claims, due in large part to a significant threshold question, whether the FLSA's minimum wage and overtime requirements should apply to Fancy Hands' virtual assistants, who Defendant classifies as independent contractors; and (b) the amount of time that the virtual assistants actually were engaged in performing the tasks.

The determination of whether Defendant's virtual assistants are correctly classified as independent contractors instead of employees involves a fact-specific inquiry into the terms and conditions of each individual Plaintiff's employment as well as the nature of Fancy Hands' business. While it is undisputed that the virtual assistants can work from home, set their own hours, and only claim the tasks that they choose to perform, there is a dispute as to the amount of direction and control that Fancy Hands has over its virtual assistants once a task is claimed, and how long it typically takes to complete a task. Many virtual assistants claim just a handful of tasks per month and spend less than an hour per week on those tasks. A resolution of this classification question would require a close evaluation of numerous issues of fact, including the degree to which Fancy Hands exercised supervision or control over virtual assistants and their work, the extent to which Fancy Hands evaluated the work performed by virtual assistants, the duration of virtual assistant's employment with Fancy Hands, the extent of virtual assistants' investment and opportunity for profit or loss, and virtual assistants' specialized skills. The analysis for each assistant is different and class-wide patterns may not exist sufficient to justify a collective action.

Due to the fact-intensive nature of these inquiries, it is likely that the employment status of virtual assistants would not be resolved until after significant discovery and briefing, if not at trial. Accordingly, for settlement purposes only, the parties focused their efforts on the other primary issue in this matter – the amount of hours worked by Plaintiffs and amounts paid by Defendant for those tasks. If the FLSA were to apply to the virtual assistants, they would be entitled to not less than the minimum wage for each hour worked, plus overtime premiums (i.e. 1.5 times their regular hourly rate) for hours worked over 40 hours in a week.

To facilitate the settlement discussions, Defendant produced a damages analysis spreadsheet for each of the Plaintiffs detailing, among other items, the following information: number of requests completed for each week; total paid by Fancy Hands for each week; number

---

[1] During the next several weeks, Plaintiffs' counsel retained four (4) additional virtual assistants who were included in the negotiations and who later joined the action by filing their consent to become party plaintiff forms with the Court. (*See* Dkt. Nos. 17-20).

of minutes that the browser window was open for each task; average hourly rate using the browser window open metric, potential overtime using the browser window open metric; amount allegedly owed on overtime claim; and amount allegedly owed on minimum wage claim. The "browser window open" time was determined, for settlement purposes only, to be the most conservative and accurate way to estimate the amount of time that could possibly have been spent by a virtual assistant performing each task so that the maximum amount of potential wages owed for the task could be calculated on an hourly basis to determine the unpaid minimum wage and overtime, if any. For those Plaintiffs who also served as "mentors" for Fancy Hands whereby they would review and approve the tasks completed by other virtual assistants, Defendant also produced a spreadsheet detailing the tasks that had been mentored by each Plaintiff throughout their time being associated with Fancy Hands. Fancy Hands' virtual assistants were paid $0.10 for each task that they mentored, regardless of the amount of time that it took the virtual assistant to mentor the task.

Through this voluntary exchange of data, Plaintiffs' view of the merits has evolved as the parties exchanged discovery relating to the time spent performing tasks by the virtual assistants. Significantly, although Plaintiffs dispute the accuracy of Defendant's records, Plaintiffs acknowledge that there would be difficulty in overcoming the time records maintained by Defendant in attempting to prove their unpaid wage claims based on Plaintiffs' best estimates. Moreover, the type of tasks involved and the amount of payment for each task completed could create individualized issues that significantly weigh against the action proceeding as a collective or class action.

In addition to the risks regarding the merits of the claims, a significant factor in deciding to negotiate an early resolution to the action on an individual basis is Fancy Hands' financial condition, which was shared with Plaintiffs, on a confidential basis, as a part of the voluntary exchange of discovery. As is true with many start-up companies, Fancy Hands relies in large part on funding from venture capitalists and other investors to support its growing business and, without that funding, the company would not be able to continue to operate. With the filing of this lawsuit, significant potential future investments and partnerships for Defendants were jeopardized - being put on hold or retracted. The longer the litigation continues, the less likely it is that Fancy Hands would be able to continue its operations.[2] Accordingly, resolving the action on behalf of the Plaintiffs at this early juncture provides certainty in that they will receive compensation for their alleged unpaid wages instead of the very likely possibility that if the litigation continues, Fancy Hands will be forced to cease operations and the Plaintiffs risk receiving no compensation for their claims.

### III. Settlement Terms

As set forth in the attached Settlement Agreements, the parties have agreed to settle this action for a total settlement amount of $30,250 (the "Settlement Amount"), divided among the Plaintiffs in accordance with their alleged unpaid minimum and overtime wages. Named Plaintiff

---

[2] Less than 60 days ago Homejoy, another gig economy start up, was forced to cease operations because it could not afford to defend FLSA misclassification lawsuits or raise additional capital with those lawsuits pending.

Honorable Vernon S. Broderick
August 19, 2015
Page **4** of **5**

Callier is also allocated an amount for her separation from Fancy Hands and for executing a general release against Defendant. Of the Settlement Amount, $700.00 has been allocated as costs and $9,850.00, representing one-third (33.33%) of the Settlement Amount after subtracting costs, as attorneys' fees. The costs portion compensates Plaintiffs' counsel for the expenses of filing this action and serving process. The retainer signed by Plaintiffs with Plaintiffs' counsel makes clear that Plaintiffs' counsel is compensated solely by a percentage of a judgment or settlement not to exceed costs plus one-third of the settlement. Plaintiffs will receive the remaining $19,700.00.

In light of the significant litigation risks outlined above, all parties believe that this settlement is fair. Although there is a possibility that Plaintiffs could recover higher damages if the case proceeded to trial, there is also the possibility that they could receive much lower damages, or nothing at all, and as such, the risks and uncertainties discussed above are substantial. Moreover, Plaintiffs will be able to recover settlement funds more expeditiously, and with more certainty, than a trial judgment, since the parties would need to take depositions, brief numerous motions on the merits and class and collective treatment and engage in further discovery for any additional plaintiffs who might join at a later stage of the case before trial could commence.

Furthermore, the attorneys' fee award is reasonable in light of the amount of work that Plaintiffs' counsel has put into this case, including in researching and investigating the claims prior to filing the lawsuit. Although the parties reached this settlement at a very early stage in the litigation, Plaintiffs' counsel has nevertheless expended well over 60 hours in this matter, performing research, reviewing and analyzing documents from Plaintiffs and spreadsheets from Defendant, negotiating settlement both in person and over the phone with Defendant's counsel, and discussing the case at great length with the Plaintiffs. Plaintiffs' counsel performed significant research prior to filing the complaint regarding Fancy Hands and the claims alleged by Callier and continued to research the issues with information provided by the Plaintiffs after Defendant exchanged their damages analysis. Almost from the outset, counsel for both parties engaged in informal exchange of information and settlement discussions in order to evaluate the merits of the case in an efficient fashion.

\*          \*          \*

As demonstrated above, the settlement is a result of substantial negotiations and compromise by both parties. The parties believe that the proposed settlement is completely fair, reasonable, and adequate to the Plaintiffs in light of the risks of litigation and the Defendant's financial condition, and should be approved.

We appreciate Your Honor's attention to this matter. Please contact the undersigned should you have any questions regarding this submission.

Honorable Vernon S. Broderick
August 19, 2015
Page **5** of **5**

Respectfully submitted,

| **PELTON & ASSOCIATES PC** | **FISHER & PHILLIPS LLP** |
|---|---|
| By:   */s/ Brent E. Pelton*           | By:   */s/ Kathleen M. Caminiti*       |
| Brent E. Pelton | Kathleen M. Caminiti |
| Taylor B. Graham | Steven A. Siegel |
| 111 Broadway, Suite 1503 | 430 Mountain Avenue, Suite 303 |
| New York, NY 10006 | Murray Hill, NJ 07974 |
| Telephone: (212) 385-9700 | Telephone: (908) 516-1062 |
| Facsimile: (212) 385-9700 | Facsimile: (908) 516-1101 |
| *Attorneys for Plaintiffs* | *Attorneys for Defendant* |